# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
May 14, 2013 Session

## STATE OF TENNESSEE v. CHRISTOPHER MICHAEL HOOTEN

**Appeal from the Circuit Court for Maury County**
**No. 19679, 19949      Robert L. Jones, Judge**

_____

**No. M2012-00979-CCA-R3-CD - Filed September 27, 2013**
_____

A Maury County jury convicted the Defendant, Christopher Michael Hooten, of first degree premeditated murder, first degree felony murder, aggravated robbery, and tampering with evidence. The trial court imposed a life sentence for the merged murder convictions and concurrent sentences of eight years for the aggravated robbery conviction and three years for the tampering with evidence conviction. On appeal, the Defendant contends that: (1) the trial court erred when it denied his motion to suppress evidence found during the search of his vehicle; (2) the trial court erred when it excluded a videotaped confession from a co-defendant; and (3) the evidence is insufficient to support his convictions. After a thorough review of the record and the applicable law, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and ROGER A. PAGE, JJ., joined.

Michael D. Cox, Columbia, Tennessee, for the appellant, Christopher Michael Hooten.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; Mike Bottoms, District Attorney General; Brent A. Cooper and Kimberly L. Fields Cooper, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

# I. Facts

This case arises from the robbery and murder of Harold Wayne Clemons outside the Wayside Inn in Columbia, Tennessee. For his role in these crimes, a Maury County grand jury indicted the Defendant for first degree premeditated murder, first degree felony murder, aggravated robbery, and tampering with evidence. A co-defendant, Marvin Kelley, was also indicted in these crimes.

## A. Suppression Hearing

The Defendant filed a motion to suppress all evidence found during the search of his vehicle following an investigatory stop. At the time of the suppression hearing, the Defendant's case was joined with co-defendant Kelley's case. We will focus on the facts pertinent to the Defendant's case: Scott McPherson, a Columbia Police Department officer, testified that at around midnight on March 6, 2010, he received a dispatch to be on the look out ("BOLO") for assault suspects to be detained for investigation. The possible suspects were thought to be driving "a maroon square body style Cadillac, occupied by two white males." Officer McPherson said that he patrolled the area near the crime scene looking for a vehicle consistent with the radio dispatch.

Officer McPherson testified that he spoke with Officer Steve Ellis and learned of a residential address on Bandywood Drive[1] where a car matching the description might be found. Officer McPherson proceeded to the address and did not see any vehicle matching the description. As he was leaving the area, he observed a vehicle matching the dispatch description driving toward Bandywood Drive. Officer McPherson turned his vehicle around and observed the Cadillac turning onto Bandywood Drive. Officer McPherson followed the vehicle onto Bandywood Drive, where the vehicle parked in the driveway of a residence. Officer Ellis was also on Bandywood Drive at the time of the stop and assisted Officer McPherson.

Officer McPherson said that he shined his spotlight into the Cadillac and saw two men. He said that he recognized the Defendant, the driver, from "previous dealings." Officer McPherson proceeded to conduct a "felony stop" by ordering the two occupants out of the car at gunpoint. The State played portions of a video recording of the stop. Officers patted down the Defendant, and then handcuffed him and placed him in the back of Officer Ellis's patrol car. The same procedure was followed with the passenger, Marvin Kelley, who was placed in Officer McPherson's patrol car. Officer McPherson

---

[1] The street name where the Defendant was apprehended is spelled as both "Bandiwood" and "Bandywood" in the transcripts. For consistency, we spell the street name Bandywood.

explained the procedure for a felony stop was to detain the suspects until a detective arrived. Officer McPherson recalled that it took approximately an hour for Detective Reed to arrive.

Officer McPherson testified that he advised the Defendant of his *Miranda* rights twice. The Defendant responded to the officer that he understood his rights and knew his rights. After the second time the Defendant was advised of his rights, Officer Ellis spoke with the Defendant. The Defendant stated that he had been at a friend's house and that "they" had been "looking for drugs." Officer McPherson said that the Defendant never indicated that he wished to invoke his rights.

Steve Ellis, a Columbia Police Department officer, testified similarly to Officer McPherson about the events leading up to the stop. Officer Ellis said that he had known the Defendant for over twenty-two years and recognized him as the driver of the Cadillac. Officer Ellis estimated that the stop was conducted thirty to forty minutes after the BOLO was issued. The Defendant was placed in the back seat of Officer Ellis's car and advised of his *Miranda* rights. Based upon his prior relationship with the Defendant, Officer Ellis attempted to speak with the Defendant. The Defendant asked about the stop and "what was going on." Ellis described this interaction as follows:

> After initially speaking to [the Defendant], right after being Mirandized, several minutes [went] by. I went back to my car, and opened the back door and - - and just tried to talk to him, you know, since we were acquaintances.
>
> I asked him, . . ."You know, it's me. You know, anything you wanted to say, you know, now would be the time to do it."
>
> And . . . [Officer] McPherson had kind of filled him in a little bit on what had gone on at the Wayside Inn, you know, told him somebody had been injured pretty severely.
>
> And . . . that second time talking to [the Defendant], he looked up and . . . he said, "Is he dead?"
>
> And - - and of course, I told him, I said, "You know, . . . I don't know. You know I hadn't been [to the Wayside Inn] and I hadn't heard anything about that."
>
> And somewhere closer to - - right after him saying that, you know, I kind of felt like he was gong to open up and - - and talk to me.

3

And then [Officer] McPherson opened the front seat of my car and leaned in with his . . . mic and . . . laid it on my - - on the screen. And I think, you know, [the Defendant] saw that and [ ] then, he said, "No, sir. I'm done talking to you."

Officer Ellis testified that, other than taking the Defendant "to the bathroom" two times, he and the Defendant did not speak about the case again. Officer Ellis said that the Defendant never requested an attorney.

Officer Ellis testified that he spoke with Detective Reed when he arrived and informed the detective that both the Defendant and Kelley had been issued *Miranda* rights.

On cross-examination, Officer Ellis agreed that, when speaking with the Defendant that night, the Defendant said, "I'm done. I'm done." Officer Ellis said that he interpreted this to mean that the Defendant was finished talking to him. He did not interpret this statement as the Defendant invoking his right to remain silent or requesting an attorney. Officer Ellis explained that because the Defendant's statement came after he observed Officer McPherson place a recording device in the car, Officer Ellis believed the Defendant meant that he did not want to be recorded.

Jamie Reed, a Columbia Police Department detective, testified that he arrived at the Wayside Inn at approximately 12:46 a.m. on March 6, 2010. When he arrived, officers on the scene told him that the victim's injuries were life-threatening and that the victim was not expected to survive. Based upon this information, Detective Reed treated the area as a major crime scene. Detective Reed was in the middle of processing the scene when he learned that the suspects had been detained. Detective Reed testified that he made an effort to get to the location where the suspects were detained, Bandywood Drive, as quickly as possible while maintaining the integrity of the investigatory process at the scene. Detective Reed said that he arrived at Bandywood Drive at 1:38 a.m.

Detective Reed testified that, upon his arrival at Bandywood Drive, he spoke with the officers present and learned that each defendant had been advised of his rights. He said that, because he knew the Defendant "personally," he proceeded to the police car where the Defendant was sitting to speak with him. Detective Reed confirmed with the Defendant that he had been read his *Miranda* rights, and the Defendant said that he understood his rights. The detective then asked the Defendant for permission to search his vehicle. The Defendant responded that police could search the vehicle if he was allowed to stand beside the car during the search. Detective Reed said that he allowed the Defendant to observe the search. After a bloody shoe was found in the trunk of the car, the Defendant said, "Okay, how about this, how about I invoke my rights." Detective Reed said that, based on this statement, police discontinued the search and placed the

4

Defendant back in the patrol vehicle.

Detective Reed testified that he obtained a search warrant for the Cadillac, and police continued the search of the car at the police impound lot. He said the car was registered in the Defendant's name.

The trial court took the motion under advisement and later issued an order denying the Defendant's motion to suppress the evidence found during the search of his vehicle. The trial court found the Defendant's statement to Officer Ellis to be an unclear articulation by the Defendant of an intent to invoke his right to remain silent or right to counsel. "[The Defendant] stated he understood his rights, and it would logically follow that if he chose to exercise his right to remain silent or right to counsel, he would clearly articulate that to Detective Reed or other officers, before the search of the vehicle led to the bloody shoe, just like he did after the shoe was found." The trial court found that the Defendant's conditional consent to the search was given before he invoked his rights. The trial court noted that, even if the search was unlawful, the evidence would have been lawfully obtained under the "inevitable discovery" doctrine.

## B. Trial

The parties presented the following evidence at the Defendant's trial: James Harold Clemons, the victim's father, testified that his son was born and raised in Arkansas. He estimated that the victim had moved to Tennessee with his wife six or seven years earlier. The victim and his wife had one child together. The couple divorced, but the victim remained in Tennessee. Clemons recalled that, when he learned of his son's admission to Vanderbilt Hospital related to this incident, he immediately drove to Nashville. He described for the jury seeing the victim in the trauma unit. "It didn't even look like my son. His face and his head was about this big around (indicating). He had tubes everywhere, he couldn't - - he was basically dead." The victim was not responsive, so he was unable to communicate with the victim. Clemons said that he remained with his son at the hospital until his son's death the following day.

April Drew, the victim's ex-wife, testified that she and the victim divorced in 2007 when their daughter was approximately two and a half years old. Drew said that, after the divorce, the Defendant remained active in his daughter's life. Drew acknowledged that the victim drank "a beer or two occasionally" but said that she had never known him to use illegal drugs. Drew said that the victim always carried, in his front, left pants pocket, "a little plastic thing for photos" and his money in a clip. She said that the victim suffered from back pain and kept Lortab and an anti-inflammatory on his person at all times. The victim also took a medication for depression. She said that he carried those medications in a "kidney shaped pill container" in his pocket. Drew identified the victim's pill container

5

in a photograph of a pill container found near the victim at the crime scene.

Drew testified that the victim spent the night before this incident at her home with their daughter. She described him as "happy" and playing "beauty shop" with their daughter. The following morning, they ate breakfast together, and then, at around noon, she drove the victim "home." Drew recalled that the victim called her on the telephone at around 5:00 p.m. to invite her out for a drink, but she was unable to go. The following day, Drew received a phone call from one of the victim's roommates asking if Drew had seen the victim. Drew said that she became concerned upon learning that the victim had not returned to his home the previous night. She had heard about an unidentified man being air-lifted to Vanderbilt Hospital for treatment, so she began seeking the identity of that man. Ultimately, she went to Vanderbilt Hospital and identified the victim for police. She described the victim's eyes as black and his head and face as severely swollen.

Sandra Ragsdale testified that the victim had rented a room in her home for approximately two years. Ragsdale described the victim as a "very good tenant" and as "respectful" toward her. Ragsdale recalled that, on the day of these events, the victim had been drinking "a little bit." He wanted to go out to a bar, and Ragsdale attempted to convince him to stay at home instead. When the victim persisted, Ragsdale gave him her cellular phone to carry with him in case he needed someone to pick him up. Ragsdale identified the cellular phone that she provided the victim that night. Later that night, Ragsdale attempted unsuccessfully to contact the victim by phone. When the victim did not answer the phone, she grew concerned. She said that the victim did not drink frequently, and it was unlike him to not call and let her know he was okay. Ragsdale said that she did not see her cellular phone again until she was in court.

Mark Dugger testified that he rented a room from Ragsdale during the time the victim lived in the home. Duggar said that, on the day of these events, he drove the victim to the store to buy beer. Duggar observed the victim counting his money, approximately $100.00, before he purchased the beer. The two men returned to the house where the victim drank beer and grilled. Later that evening, the victim went to a bar. Duggar said that he called the victim at around 9:30 p.m. to see if the victim needed a ride home, but the victim did not answer the phone. Duggar called the cellular phone a few times more before going to bed, but the calls were unanswered. The next morning, Duggar began placing phone calls to the jail, hospital, and friends in an attempt to find the victim.

Dawn Scribner testified that the last time she saw the victim was at a cookout at Ragsdale's house. After eating, the victim asked Scribner to drive him to Huck's Bar and Grill, and Scribner agreed. Scribner recalled that the victim had "around $70.00," and she gave him an additional $20.00 "in case he [ ]need[ed] to eat."

6

Robert Reed testified that he did not know the victim or the Defendant. He said that, on the night of March 6, 2010, he had a "few beers" at the Wayside Inn and then went "out back" to his friend's motor home to lay down on the couch. As he was lying on the couch, he heard a commotion outside. He opened the door to the motor home and saw a man lying on the ground, who was bleeding from his ears and head. Reed described the man as lying on his side and "gurgling." Reed looked around and saw two men, one "large" and the other "small," walking away from him and toward an "early model '90s" burgundy Cadillac. Reed said that he went back inside the motor home, put on his boots, and then walked to the Wayside Inn to have someone call 9-1-1. He then returned outside to check on the man lying on the ground. He said that the men who had been walking toward the Cadillac were "long gone" by the time he returned outside.

Bill Denton, a Columbia Police Department officer, testified that he was supervising the third shift on March 6 and 7, 2010. He responded to a call from the Wayside Inn where a man had been found lying on the ground. Lieutenant Denton described for the jury the computer-aided dispatch ("CAD") system employed at the police department to log and track dispatch calls and police response. He identified the CAD report from the Wayside Inn call. The lieutenant testified that the report showed that the first unit was dispatched at 11:55 p.m. Lieutenant Denton said that he arrived on the scene at 11:58 p.m., and the victim was transported to the hospital by 12:36 a.m. Based on the severity of the injuries, Lieutenant Denton determined that a detective would be needed, and Detective Reed arrived at the scene at 12:46 a.m. Lieutenant Denton testified that the CAD report showed that Officer Ellis conducted a stop of the Defendant's vehicle at 12:42 a.m.

Sarah Howell, a Columbia Police Department officer, testified that she responded to a report that a male had been assaulted and thrown out of a vehicle at the Wayside Inn. When she arrived, she found an unconscious, white male lying face down. She noticed a large laceration on the back of the victim's head and blood coming from his ear. She felt for a pulse. When she could not discern a pulse, she and Lieutenant Denton turned the victim over to begin administering CPR. Officer Howell recalled that EMS and the fire department arrived as they were about to begin CPR and assumed medical care of the victim. She said that another officer searched the victim for identification but found none.

Jason Terlecki, a Columbia Police Department officer, testified that he responded to a call from the Wayside Inn. He said that he and Lieutenant Denton arrived at about the same time and that both men walked toward a motor home and found an unconscious, white male lying on the ground. Officer Terlecki searched the man for some form of identification but found none. He found a small knife in the victim's back pocket and "some money" in the man's right shirt pocket. Officer Terlecki also observed a capsule with various pills lying next to the victim's head.

7

Officer Scott McPherson, a Columbia Police Department officer, testified that, based upon the dispatch call about the BOLO for a "late '90s model Cadillac," he conducted a felony stop of a vehicle the Defendant was driving on March 7, 2010. The officer testified consistently with his account of the events during the suppression hearing. Officer McPherson also identified the recording taken with the video camera in his vehicle. The State played the video for the jury while Officer McPherson narrated. Officer McPherson recalled that both the Defendant and his passenger, Kelley, exited the car through the driver's side door. Kelley told police that the passenger side door would not open.

Officer McPherson said that, while the Defendant was in the back of the patrol car, he noticed the Defendant removing his shoes. On the video, there is an exchange between Officer Ellis and the Defendant during which Officer Ellis asks the Defendant why he removed his shoes, and the Defendant responds that the shoes were three sizes too big.

Officer McPherson testified that, after Detective Reed arrived, Detective Reed asked the Defendant for permission to search his vehicle. The Defendant responded that "he'd allow [Detective Reed] to search as long as he went up there with [Detective Reed]." Officer McPherson testified that he participated in the search of the vehicle and found a size 13 shoe with blood on it. At the time, the Defendant was standing approximately ten to fifteen feet away from Officer McPherson. The Defendant was returned to the back seat of the police car. He was in the vehicle alone but a microphone that Officer McPherson had earlier placed in the car was still recording. On the video recording, the Defendant made a statement. Officer McPherson said that, "[The Defendant] said that nobody had done nothing, it was a dog that cut his leg that bled all over that shoe."

Officer Steve Ellis, a Columbia Police Department officer, testified that he participated in the investigation involving the Defendant on the night of March 6, 2010. Officer Ellis's testimony was consistent with his testimony at the suppression hearing regarding the events of that night. Officer Ellis testified that he had known the Defendant for many years and recognized the description of the vehicle issued in the BOLO as similar to the Defendant's vehicle. Officer Ellis drove by the Defendant's residence, and the Defendant drove up while Officer Ellis was still on the street. Officer Ellis and Officer McPherson conducted a felony stop and detained the Defendant and Kelley in separate police vehicles.

Officer Ellis testified that the Defendant repeatedly asked the officer why he had been stopped and what was "going on." Officer Ellis told the Defendant that a detective was on the way and that if there was anything the Defendant wanted to talk about, now would be a good time. Officer Ellis said the Defendant hesitated and then asked, "is he dead?" Officer Ellis told the Defendant he did not know. Officer McPherson then placed

a recording device inside the car, and the Defendant "clammed up at that point." Officer Ellis recalled that Detective Reed arrived soon thereafter and questioned the Defendant and Kelley. Officer Ellis stated that the Defendant never admitted to him any involvement in the incident at the Wayside Inn.

Officer Ellis testified that the Defendant removed his shoes while in the back seat of the police car. When asked about his removal of his shoes, the Defendant said the shoes were too big. Officer Ellis stated that, while waiting for Detective Reed to arrive, he took the Defendant out of the back seat of the police car twice to "use the restroom." Officer Ellis accompanied the Defendant at all times while outside the vehicle and never observed the Defendant drop or throw anything.

After leaving the scene of the stop, Officer Ellis drove the Defendant to the detectives' office. After they arrived, the Defendant indicated he needed to go the bathroom "bad." Officer Ellis interpreted this to mean that the Defendant needed to have a bowel movement. Based on this comment, Officer Ellis took off the Defendant's handcuffs and let him go inside the bathroom alone. The Defendant had been searched for weapons but had not yet been strip-searched. After several minutes, the Defendant emerged from the bathroom, and Officer Ellis handcuffed him and took him back to the lobby. Officer Ellis said that he noticed "a considerable amount of water inside the bathroom" after the Defendant finished in the bathroom. He said that the Defendant "was agitated," so Officer Ellis thought the Defendant "maybe purposely made a mess."

On cross-examination, Officer Ellis testified that, after Officer McPherson advised the Defendant of his *Miranda* rights, he told the Defendant that police were investigating a possible homicide. Officer Ellis agreed that Officer McPherson informed the Defendant of the investigation before the Defendant asked Officer Ellis if the victim was dead.

Randy Blackburn testified that he worked as a plumber. He recalled that, on March 16, 2010, he worked at the Columbia detective's office unclogging a toilet in the men's bathroom. Blackburn said that he extracted an object from the toilet that appeared to be "personal items, man's name, like, insurance card or something like that, with Wayne Clemons on it." Based on its size, he initially thought the retrieved item was a calculator, approximately one half inch thick. He placed no significance on the item and because it was "dirty" he "tossed it in the trash can." Shortly thereafter, an employee came in to the bathroom and asked about the clog. Blackburn indicated that he put the item in the trash can.

Jeremy Alsopp, a Columbia Police Department officer, testified that, in March 2010, the toilet in the men's restroom had not been operating correctly for approximately ten days when, on March 16, 2010, a plumber came to repair the toilet. Lieutenant Alsopp

9

recalled that he was sitting at his desk when he overheard the plumber ask who was "Harold Clemons." Recognizing the victim's name, Lieutenant Alsopp got up from his desk and went to the doorway of the men's restroom. He saw an item in the toilet covered in feces. He retrieved gloves and removed the item from the toilet. He described the item as a "small black non-folding, clear covered wallet." He wiped it off with paper towels and saw an identification card with the victim's name and photograph on it. There were additional cards, such as prescription cards, behind it.

Mark Craig, a Columbia Police Department detective, testified that on March 7, 2010, his supervisor requested he assist with a search warrant for the Defendant's vehicle. Detective Craig said that the focus of the search was to collect DNA samples and fingerprints. Detective Craig identified photographs he had taken of the vehicle. Detective Craig identified a shoe and a tire tool that were removed from the Defendant's trunk. He said that the men's shoe taken from the trunk was a left, size 13 shoe. Inside the compartment of the vehicle, a camouflage wallet containing the Defendant's driver's license was found in the console area. The car registration, indicating the owner of the vehicle as the Defendant, was found in the glove box.

Detective Craig testified that, approximately eleven days after this initial search, Detective Reed asked him to check the operating condition of the vehicle's doors and windows. Detective Craig tested the doors and windows and found that the passenger side windows could not be opened, but all of the doors worked from the inside and the outside of the vehicle.

Andre Martin, a Columbia Police Department officer, testified that, on April 1, 2010, he went to Vanderbilt Medical Center and retrieved personal items found on the victim's person while he was treated at the hospital. From the hospital, Lieutenant Martin retrieved $31.10, and from the Vanderbilt Police Department, he retrieved the victim's pocket knife.

Jamie Reed, a Columbia Police Department detective, testified that he was assigned to investigate the case involving the Defendant. Sergeant[2] Reed said that he was notified of the case shortly after midnight on March 7, 2010. He arrived at the scene approximately twenty-three minutes later where he was briefed by officers on the scene. He said that, at this time, the victim had already been transported to the hospital and the scene secured.

---

[2] At the time of the trial, Jamie Reed served as a sergeant over juvenile administrations for the Columbia Police Department. Thus, in the trial testimony, we refer to him by his most current title, Sergeant.

Sergeant Reed testified that, after surveying the scene, he determined that he would process the scene himself because it was a small area. Sergeant Reed photographed the crime scene and collected a pill container with loose pills found near the victim for analysis. DNA samples from the blood puddles were taken and also submitted for testing.

Sergeant Reed testified that, while processing the scene, he received information that a suspect vehicle had been stopped and the occupants detained. At this point, Sergeant Reed was "more than half way" through with his work at the scene, so he completed his work at the scene before proceeding to Bandywood Drive. Sergeant Reed talked with officers at the Bandywood Drive scene before talking to either suspect. After confirming with the Defendant that he had been advised of the *Miranda* rights, Sergeant Reed spoke with him. The Defendant agreed to allow police to search the vehicle if the Defendant would be permitted to stand next to Sergeant Reed and observe the search. Sergeant Reed agreed, and the Defendant stood next to the detective by the Cadillac while two other officers searched the vehicle. Officer McPherson walked over to Sergeant Reed and whispered in his ear that "there's a bloody shoe in the trunk." Immediately, the Defendant stated that he wanted to invoke his rights. The police officers ceased the search, and the Defendant was returned to the back of a police car.

Sergeant Reed testified that later, at the detective's office, he collected the Defendant's and Kelley's clothing and personal effects. He explained that he checked the Defendant's clothing for presumptive blood or DNA with chemical and lighting tests and that he did not find anything warranting further testing at the Tennessee Bureau of Investigation ("TBI"). Kelley's pants, however, appeared to have dried blood on them and were sent to the TBI for further testing. Sergeant Reed said that, after conducting preliminary testing on the tire tool found in the trunk of the Defendant's vehicle, he did not send the tire tool to the TBI for further testing. A cellular phone that was collected from Kelley at the time of the arrest was later determined to be the victim's landlord's phone. Sergeant Reed said that the victim's clothing and belongings were also collected as evidence.

On cross-examination, Sergeant Reed confirmed that none of the clothing the Defendant wore at the time of arrest had blood on it. Sergeant Reed said that the Defendant's fingerprints were not found on any item collected in this case. The Defendant's DNA was not found on the victim's clothing, the bloody shoe found in the trunk of the Cadillac, or the pill container found lying near the victim. Sergeant Reed agreed that Kelley was over six feet tall and weighed approximately three hundred pounds while the Defendant was about five feet, five inches tall and weighed "100-some-odd pounds."

Brent Trotter, a TBI forensic scientist, testified as an expert witness in the field of

forensic chemistry and analysis. Agent Trotter examined the pills in the plastic container found near the victim at the Wayside Inn. He determined that the pills were not controlled substances and were Motrin, Buspar, Flexeril, and Mevacor. Agent Trotter said that he tested "a loose pill" and determined that the pill contained Hydrocodone, a Schedule II drug.

Charles Hardy, a TBI forensic scientist, testified as an expert witness in the field of serology and DNA analysis. Agent Hardy testified that police provided him with DNA samples from the Defendant, Kelley, and the victim. He used the samples for comparison with items of evidence submitted in this case. He said that blood spatter found on the pill container matched the victim's DNA. Agent Hardy also took a sample from a blood stain found on the instep of a Nike shoe that was recovered from the Defendant's vehicle pursuant to a search warrant. The blood from the shoe matched the victim's DNA. A swabbing inside the shoe for epithelial cells produced a profile matching Kelley's DNA standard. Agent Hardy said that he took samples from two other areas inside the shoe but that the DNA was either insufficient or degraded.

Agent Hardy testified that he also tested a reddish-brown stain on Kelley's jeans. The DNA sample extracted from this stain matched the DNA sample for the victim. Agent Hardy also tested the blood stains on the shoe found in the trunk of the Defendant's vehicle during the consent search. The DNA profile matched the DNA sample for the victim. Agent Hardy said that he swabbed the inside of the shoe and the DNA profile obtained was consistent with a mixture of genetic material from at least two individuals. He said that Kelley was the major contributor of the material and that neither the victim nor the Defendant could be excluded as the minor contributor to the mixture.

On cross-examination, Agent Hardy confirmed that none of the profiles obtained matched the Defendant's DNA profile.

Adele Lewis, a medical examiner, testified as an expert witness in the field of forensic pathology. After explaining an autopsy procedure to the jury, Dr. Lewis spoke specifically about her findings related to the victim's autopsy. Dr. Lewis said that the victim had multiple injuries to his head, two black eyes, and "bloody fluid" coming out of his nostrils and ears. The victim also had a patterned contusion or bruise on the lower portion of his back. She said that a "patterned contusion" is a bruise that "was left by an object that leaves a certain pattern." The pattern on the victim was two parallel purple lines. The victim also had further bruising on his arms and right thigh.

Dr. Lewis testified about the internal injuries the victim sustained. She said that she found extensive bruising on the left side of the victim's scalp and bruises on the brain. She noted a significant amount of swelling to the brain and a fracture at the base of his

skull. Dr Lewis found "bleeding over the surfaces of the brain and fractures of his third, fourth and sixth ribs." She explained that fractures to ribs are generally caused "by some sort of blunt force injury." Based upon the victim's injuries, Dr. Lewis estimated that the victim sustained multiple "blows." She also opined that a tire tool, like the one found in the Defendant's Cadillac, could have caused the skull fracture and the patterned bruising on the victim's back. Dr. Lewis testified that the cause of death was blunt force injury to the head and the manner of death was homicide.

Burnace McDonald testified that he first met the Defendant and Kelley in the Maury County jail waiting for transportation to court. McDonald explained that four or five days earlier, he had been charged with felony DUI. While waiting, the Defendant was seated next to McDonald, and Kelley was standing next to the Defendant. McDonald and the Defendant began conversing, and the Defendant told McDonald that he was in jail for assault. McDonald asked the Defendant if "he just kicked the man." The Defendant responded, "no, I got my licks in, too." McDonald said that he interpreted this to mean that the Defendant hit or punched the victim in addition to kicking him. The Defendant further told McDonald that he was "going to say he didn't get out of the car . . . because there was no sense in both of them getting in trouble for the same thing."

The State rested its case, and the Defense called co-defendant Marvin Wendell Kelley, Jr. to testify. In the absence of the jury, Kelley invoked his Fifth Amendment Right and refused to testify. His attorney explained that Kelley's case was being appealed, and, therefore, he had advised his client to invoke his rights.

Wes Bryant testified that he initially represented the Defendant in general session court. He handled the Defendant's preliminary hearing held on March 17. The court dockets from that date reflect that Burnace McDonald was also scheduled to appear in court on March 17. Bryant recalled that the courtroom was "packed" on March 17, and therefore, he had no recollection of whether McDonald was in the courtroom during the Defendant's hearing.

Linda Orr, the Defendant's mother, testified that for Christmas in 2009, she gave her son a pair of size nine tennis shoes.

Based upon this evidence, the jury convicted the Defendant of first degree premeditated murder, first degree felony murder, aggravated robbery, and tampering with evidence. The trial court merged the murder convictions and imposed a life sentence and concurrent sentences of eight years for the aggravated robbery conviction and three years for the tampering with evidence conviction. It is from these judgments that the Defendant now appeals.

13

## II. Analysis

The Defendant asserts that: (1) the trial court incorrectly denied his motion to suppress evidence found during the search of his vehicle; (2) the trial court erred when it excluded a videotaped confession from his co-defendant; and (3) the evidence is insufficient to support his convictions.

## A. Motion to Suppress

The Defendant asserts that the trial court erred when it denied his motion to suppress. The Defendant's central issue appears to be whether Detective Reed's request to search the Cadillac was improper. The State responds that the Defendant had not invoked his right to silence at the time of the request, and, even if he had, a request from law enforcement for consent to search is not interrogation.

In its written ordering denying the motion to suppress, the trial court made the following findings:

> Officer Ellis testified that he did not interpret what [the Defendant] said to him as [the Defendant] invoking his *Miranda* rights. The statement occurred immediately after Officer MacPherson [sic] placed a recording devise [sic] in the vehicle, and Officer Ellis took the statement to mean that [the Defendant] did not want to make a statement that was being recorded.

> The Court finds that [the Defendant]'s statement did not invoke his right to remain silent or his right to counsel. [The Defendant]'s statement was not a "clear articulation." [The Defendant] stated he understood his rights, and it would logically follow that if he chose to exercise his right to remain silent or right to counsel, he could clearly articulate that to Detective Reed or other officers, before the search of the vehicle led to the discovery of a bloody shoe, just like he did after the shoe was found.

After specifically finding that the bloody shoe was not the fruit of an illegal search, the trial court went on to state that, even were the bloody shoe the fruit of an unlawful search, the evidence would be admitted under the "inevitable discovery" doctrine. The order states, "Discovery of the bloody shoe was inevitable incident to arrest."

Our standard of review for a trial court's findings of fact and conclusions of law on a motion to suppress evidence is set forth in *State v. Odom*, 928 S.W.2d 18 (Tenn. 1996). Under this standard, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." *Id*. at 23. As is customary, "the prevailing

14

party in the trial court is afforded the 'strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.'" *State v. Carter*, 16 S.W.3d 762, 765 (Tenn. 2000) (quoting *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998)). Nevertheless, this Court reviews *de novo* the trial court's application of the law to the facts, without according any presumption of correctness to those conclusions. *See State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001); *State v. Crutcher*, 989 S.W.2d 295, 299 (Tenn. 1999). The trial court, as the trier of fact, is able to assess the credibility of the witnesses, determine the weight and value to be afforded the evidence, and resolve any conflicts in the evidence. *Odom*, 928 S.W.2d at 23. In reviewing a trial court's ruling on a motion to suppress, an appellate court may consider the evidence presented both at the suppression hearing and at the subsequent trial. *State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1998).

The Fifth Amendment to the United States Constitution and Article I, Section 9 of the Tennessee Constitution protect a defendant from compelled self-incrimination. *Miranda v. Arizona* bars the admission of any statements elicited from a defendant through police initiated custodial interrogation unless the defendant, prior to making the statement, was warned of certain constitutional rights and knowingly waived those rights. 384 U.S. 436, 444 (1966). These procedural safeguards require that police officers advise a defendant of his or her right to remain silent and of his or her right to counsel before they may initiate custodial interrogation. *State v. Sawyer*, 156 S.W.3d 531, 534 (Tenn.2005). If the suspect indicates in any manner that he wishes to remain silent, custodial interrogation must cease. *State v. Huskey*, 177 S.W.3d 868, 878 (Tenn. Crim. App. 2005).

The record in this case shows that the Defendant was placed in the back seat of a police car and issued *Miranda* warnings twice. He confirmed that he knew and understood his rights. Officer Ellis, who had known the Defendant for many years, approached the Defendant to talk. While he and the Defendant spoke, Officer McPherson opened the car door and placed a recording device inside the car. After seeing McPherson place the recording device, the Defendant told Ellis, "No, sir. I'm done talking to you." Officer Ellis perceived this to mean that the Defendant did not want the conversation recorded. Officer Ellis did not speak any further with the Defendant about the case. When Detective Reed arrived, he confirmed with police officers present at the scene and the Defendant that the Defendant had been advised of his *Miranda* rights. After confirming with the Defendant that he had been advised of and understood his *Miranda* rights, Detective Reed asked the Defendant if police could search his vehicle. The Defendant agreed to a search of his vehicle if he were allowed to stand near the vehicle and watch police officers during the search. Detective Reed granted this request, and, after police found a bloody shoe in the trunk of the car, the Defendant invoked his rights and the search of the vehicle ceased.

15

The Defendant contends that Detective Reed "failed to scrupulously honor [the Defendant's right to remain silent." He maintains that Detective Reed "crossed the line" when he asked the Defendant for permission to search the vehicle. The State correctly points out that a request for consent to search is not an interrogation, nor is the Defendant's response an incriminating statement for *Miranda* purposes. *State v. Kyger*, 787 S.W.2d 13, 24 (Tenn. Crim. App. 1989). This Court has explained:

> Generally, "[a] consent to a search is not the type of incriminating statement toward which the fifth amendment is directed [because i]t is not in itself 'evidence of a testimonial or communicative nature.' " *United States v. Lemon*, 550 F.2d 467, 472 (9th Cir. 1977) (quoting *Schmerber v. California*, 384 U.S. 757, 761(1966)). Therefore, while "the Fifth Amendment's protection against self-incriminating statements may limit further interrogation once a person in custody invokes his right to counsel [or his right to remain silent], . . . there is no similar prohibition on securing a voluntary consent to search for physical evidence." *United States v. Knight*, 58 F.3d 393, 397 (8th Cir. 1995) (citing *Cody v. Solem*, 755 F.2d 1323, 1330 (8th Cir. 1985)). This is because "*Miranda* has to do only with police conduct reasonably likely to elicit an incriminating response, while requests made to a defendant by one seeking consent to search . . . do not constitute further questioning, or the functional equivalent of further questioning." Wayne R. LaFave, Search and Seizure, § 8.2(k) (4th ed. 2004) (footnotes and internal quotations omitted). "*Miranda* warnings are not constitutional rights in themselves, but are merely standards designed to safeguard the Fifth Amendment privilege against self-incrimination." *Smith v. Wainwright*, 581 F.2d 1149, 1152 (5th Cir. 1978). However, a consent to search, in and of itself, is not evidence which tends [to] incriminate; a search pursuant to consent may disclose incriminating evidence, but that "evidence is real and physical, not testimonial." *Cody*, 755 F.2d at 1330.

*State v. Steven Bernard Sydnor*, No. M2007-02393-CCA-R3-CD, 2010 WL 366670, at *13 (Tenn. Crim. App., at Nashville, Feb. 2, 2010) *perm. app. denied* (Tenn. June 17, 2010). Therefore, Detective Reed's request for permission to search the Defendant's Cadillac was not a violation of the Defendant's Fifth Amendment rights.

The Defendant also asserts that his consent to search the vehicle was not voluntary, and therefore, the evidence should have been suppressed. It is well-settled that a search conducted pursuant to a voluntary consent is an exception to the requirement that searches and seizures be conducted pursuant to a warrant. *State v. Bartram*, 925 S.W.2d 227, 230 (Tenn. 1996); *see also Schneckloth v. Bustamonte*, 412 U.S. 218, 243 (1973) (holding that "there is nothing constitutionally suspect in a person's voluntarily allowing a search"). The

16

sufficiency and validity of consent depend largely upon the facts and circumstances presented by each particular case. *State v. Jackson*, 889 S.W.2d 219, 221 (Tenn. Crim. App. 1993). To satisfy the constitutional reasonableness standard, the consent must be "'unequivocal, specific, intelligently given, and uncontaminated by duress or coercion.'" *State v. Simpson*, 968 S.W.2d 776, 784 (Tenn. 1998) (quoting *State v. Brown*, 836 S.W.2d 530, 547 (Tenn. 1992)). "The existence of consent and whether it was voluntarily given are questions of fact" involving an examination of the totality of the circumstances in each case. *State v. Ashworth*, 3 S.W.3d 25, 29 (Tenn. Crim. App. 1999); *see State v. McCrary*, 45 S.W.3d 36, 43 (Tenn. Crim. App. 2000).

The facts and circumstances of this case do not support the Defendant's contention that his consent was not voluntary. Detective Reed, whom the Defendant had known since their childhood, asked permission to search the vehicle, and the Defendant consented under the condition that he be allowed to observe the search. Detective Reed permitted the Defendant to observe the search as he requested. Upon police officers finding a bloody shoe in the trunk of the vehicle, the Defendant immediately and effectively invoked his "rights," causing officers to immediately terminate the search. Further, nothing on the video recording of the stop is contrary to the trial court's finding that the Defendant gave valid consent.

The Defendant also argues that the trial court erred when it made an alternative ruling that, even were it to find the search unlawful, the evidence would still be admissible under the inevitable discovery doctrine. Specifically, he asserts that because the police did not have probable cause to effectuate an arrest, the inevitable discovery doctrine does not apply. We need not address this argument based upon our conclusion that the search in this case was lawful.

Accordingly, we conclude that the trial court properly denied the Defendant's motion to suppress evidence found during the search of his vehicle. The Defendant is not entitled to relief as to this issue.

### B. Kelley's Videotaped Confession

The Defendant argues that the trial court denied him the right to present a defense when it denied his motion to play Kelley's videotaped confession. The State responds that the trial court correctly found that Kelley's statements were not sufficiently reliable or trustworthy to warrant admission into evidence. We agree with the State.

Almost a year before the Defendant's trial, the trial court granted, over defense opposition, the State's motion to join the Defendant's case with Kelley's case. Shortly before trial, however, a jailhouse informant, Michael Morgan, provided a statement about a

17

conversation between Morgan and Kelley wherein Kelley made particularly damaging statements as to the Defendant's involvement in these crimes. Morgan's statement to police is as follows:

> Sometime around the first of Aug. While on my 1 hr. wreck [sic] time I have been talking with a fellow inmate named [Kelley]. [Kelley] is in max for murder and agravatted [sic] robbery. He is on my sceduled [sic] wreck [sic] time (1 hr) for medical reasons. I'm in max for diabetes type 1. On or about (2) weeks time me and [Kelley] would talk about his case as well as mine. He told me that him and his cousin meet [sic] a guy at a bar in riverside area (were [sic] I live). And was partying with him and decided to get some crack cocaine. They seen the guy had money so they ([Kelley] and [the Defendant]) went to the bathroom without the guy and planned to beat him up and take his money. After hooking up with a good amount of crack cocaine [Kelley] and [the Defendant] ran out of money and crack. The guy who was murdered still had cash and crack. [Kelley] told me him [sic] and his cousin planned on beating and robbing this man. They beat him up then the cousin told [Kelley] to kick him again in the face, [Kelley] did. [Kelley] told me he seen a linching [sic] of one man on a "Faces of Death" movie were [sic] the nose was shot through the brain and he told em he wanted to see if it really works like the movie. He walked away from the man - He was still moving. He said and [the Defendant] told him to go back and kick him in the face. So he did. [Kelley] said ["]I tried to kill him but I did not know I did.["] He said the guy was greety [sic] with his money and dope. He said he was high off crack and drunk from the bar. He also said the only reason he got caught was the bloody shoe in the car. He had no remorse at all. He also said that the [Defendant] has his back and would cover him so he does little time. They took [the victim] to a dumpster area.

The Defendant filed a motion to sever, and Kelley was tried alone. At Kelley's trial, Morgan testified, and Detective Reed read Kelley's written statement[3] into evidence. In its brief, the State provided the following excerpt of Detective Reed's testimony reciting Kelley's statement:

> I was at Rebel and me and [the Defendant] was at the bar. We left with that guy, went to get some dope at several places, nothing happened. That guy started wanting to fight and he hit me when he grabbed my hands and I hit

---

[3] The State has provided an excerpt of the trial testimony. We do not, however, have the trial transcript from Kelley's trial in the record before us. We do have the videotaped statement, and it is consistent with the written statement.

and kicked him one time apiece in self defense.  It was self defense.  I swear I was threatened and assaulted.

The Defendant filed a motion requesting that the trial court admit Kelley's videotaped confession pursuant to Tennessee Rule of Evidence 804(a).  The Defendant "anticipated" that Kelley would assert his Fifth Amendment right against self-incrimination, causing him to be "unavailable" pursuant to Rule 804(a).  The trial court issued a preliminary order finding the motion premature because Kelley had not exercised his Fifth Amendment rights.  The trial court delayed its ruling, but it went on to state that, "the statements contained in the videotaped statement are not reliable and there will be no violation of the Defendant[]'s due process rights if the video is not admitted at trial."

At the beginning of the defense's proof, the Defendant called Kelley, who, upon advice of counsel, declined to testify.  The trial court found Kelley to be an unavailable witness, and the trial court revisited the Defendant's motion to admit the videotaped statement.  The defense argued that the videotaped statement should be admitted as a statement against interest.  The State pointed out that Kelley made multiple conflicting statements to police.  Some of the statements were exculpatory as to the Defendant, but others were not, such as statements Kelley made to fellow inmate Morgan.  The State argued that if the Defendant was allowed to play Kelley's videotaped statement, then the State would move to enter Kelley's statements to Morgan, which lead to the following exchange between defense counsel and the trial court:

> The Court:  [I]f you got to play the video recording of the interview of [ ] Kell[e]y by law enforcement officers, in which he made statements favorable to [the Defendant], and you did so under Rule 8.04, wouldn't the State also be able then to put on . . . testimony of Mr. Morgan, about what [ ] Kell[e]y said about the Defendant?  Because [ ] Kell[e]y would be unavailable to the State as well as to the defendant.
>
> Defense:  Yes.  At that point, the . . . State could attack the declarant's . . . credibility.
>
>         . . . .
>
> The Court:  Now, which would be more prejudicial to [the Defendant], to put it all in or to leave it all out?
>
> Defense:  Put it all in, that would definitely be more prejudicial to [the Defendant].

19

The trial court then ruled that Kelley had made "too many different and inconsistent statements" for the trial court to find that the out-of-court declarations are reliable for purposes of admissibility.

"Admission of evidence is entrusted to the sound discretion of the trial court, and a trial court's ruling on evidence will be disturbed only upon a clear showing of abuse of discretion." *State v. Robinson*, 146 S.W.3d 469, 490 (Tenn. 2004). Rule 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Hearsay statements are generally not allowed into evidence. Tenn Rule Evid. 802. The Tennessee Rules of Evidence, however, provide for exceptions to the hearsay rule. *See* Tenn. Rule Evid. 803 & 804. These exceptions have been carved out because they "bear sufficient indicia of reliability and trustworthiness to warrant admission." *State v. Henry*, 33 S.W.3d 797, 802 (Tenn. 2000).

Rule 804(b)(3) of the Tennessee Rules of Evidence states:

(b) Hearsay Exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

. . . .

(3) Statement Against Interest. A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true.

Rule 804(b)(3) allows for the introduction of declarations against penal interest. Tenn. R. Evid. 804(b)(3), *Advisory Comm'n Cmts*. It is up to the trial court to determine whether a statement is believable, and this Court will not overturn the trial court's decision in this regard unless there is an abuse of discretion. *See State v. James Blanton*, No. 01C01-9307-CC-00218, 1996 WL 219609, at *33-34 (Tenn. Crim. App., at Nashville, Apr. 30, 1996), *no Tenn. R. App. P 11 application filed*.

Kelley was unavailable as a witness, and the statements he made to police acknowledging his role in the victim's death may have been admissible under the statement against interest exception. Kelley's exculpatory statements about the Defendant, however, fall outside the scope of the exception, because they did not subject Kelley to criminal liability. *See State v. King*, 694 S.W.2d 941, 945 (Tenn. 1985) (statements by codefendants

20

which tend to corroborate the defendant's version of the facts but do not inculpate the codefendant are not admissible under the statement against interest exception); *State v. Sanderson*, No. M2007-00387-CCA-R3-CD, 2008 WL 624922 (Tenn. Crim. App., at Nashville, March 7, 2008), *no Tenn. R. App. P. 11 application filed*. We conclude that the trial court did not abuse its discretion in excluding the video recorded statement.

The Defendant also argues that the exclusion of the exculpatory statements violated his right to due process of law and that this right trumps the application of the Tennessee Rules of Evidence. The due process clauses of the Sixth and Fourteenth Amendments of the United States Constitution guarantee a criminal defendant the right to present a defense and call favorable witnesses. *State v. Brown*, 29 S.W.3d 427, 432 (Tenn. 2000). However, this right is not absolute, and the accused must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt or innocence. "Such rules do not abridge an accused's right to present a defense so long as they are not 'arbitrary' or 'disproportionate to the purposes they are designed to serve.'" *Id*. (citations omitted). The facts of each case must be scrutinized to determine whether the constitutional right to present evidence has been violated by the exclusion of evidence. A reviewing court must consider whether (1) the excluded evidence is critical to the defense; (2) the evidence bears sufficient indicia of reliability; and (3) the interest supporting the exclusion of the evidence is substantially important. *Id*. at 433-34.

Applying these factors, we first conclude that the excluded evidence was critical to the defense. Kelley's statements cast doubt on the Defendant's participation in the assault and robbery. As the trial court correctly pointed out, the statements, however, bear little indicia of reliability. They are uncorroborated statements by a co-defendant and are contradicted by another statement made by Kelley to a fellow inmate, in which he implicated the Defendant in the attack on the victim. The third factor is closely related to the second and also weighs against the Defendant. The hearsay rule serves an important interest in excluding testimony that is untrustworthy. *State v. Flood*, 219 S.W.3d 307, 319 (Tenn. 2007). "Out-of-court statements are traditionally excluded because they lack the conventional indicia of reliability: they are usually not made under oath or other circumstances that impress the speaker with the solemnity of his statements; the declarant's word is not subject to cross-examination; and he is not available in order that his demeanor and credibility may be assessed by the jury." *Chambers v. Mississippi*, 410 U.S. 284, 298 (1973). Balancing these three factors, we conclude that, although the statements were critical to the defense, the Defendant's right to due process of law was not violated by their exclusion because the statements were insufficiently reliable, and the governmental interest supporting their exclusion was substantially important.

Accordingly, the trial court properly excluded Kelley's videotaped statement to police. The Defendant is not entitled to relief.

## C. Sufficiency of the Evidence

The Defendant asserts that the evidence is insufficient to sustain his convictions for first degree premeditated murder, first degree felony murder, aggravated robbery and tampering with evidence. The State counters that sufficient evidence was presented from which a reasonable juror could conclude that the Defendant committed each of the crimes for which he was convicted.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *See also Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978) (quoting *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973)). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the

presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

## 1. First Degree Murder

In this case, the jury convicted the Defendant of first degree premeditated murder and first degree felony murder. The trial court merged the two convictions; however, the Defendant challenges both convictions on appeal. First degree murder is defined as a "premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1) (2010). Premeditation refers to "an act done after the exercise of reflection and judgment." T.C.A. § 39-13-202(d) (2010). Whether the defendant premeditated the killing is for the jury to decide, and the jury may look at the circumstances of the killing to decide that issue. *Bland*, 958 S.W.2d at 660. The Tennessee Code states that, while "the intent to kill must have been formed prior to the act itself," that purpose need not "pre-exist in the mind of the accused for any definite period of time" for a defendant to have premeditated the killing. T.C.A. § 39-13-202(d) (2010).

The following factors have been accepted as actions that demonstrate the existence of premeditation: the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, and calmness immediately after the killing. *Bland*, 958 S.W.2d at 660. In addition, a jury may consider destruction or secretion of evidence of the murder and "the planning activities by the appellant prior to the killing, the appellant's prior relationship with the victim, and the nature of the killing." *State v. Nichols*, 24 S.W.3d 297, 302 (Tenn. 2000); *State v. Halake*, 102 S.W.3d 661, 668 (Tenn. Crim. App. 2001) (citing *State v. Gentry*, 881 S.W.2d 1, 4-5 (Tenn. Crim. App. 1993)). Also, "[e]stablishment of a motive for the killing is a factor from which the jury may infer premeditation." *State v. Leach*, 148 S.W.3d 42, 54 (Tenn. 2004).

Felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, act of terrorism, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect, or aircraft piracy." T.C.A. § 39-13-202(a)(2) (2010). In this case, the Defendant was convicted of first degree felony murder in the perpetration of an aggravated robbery. The mental state required for this conviction was that the Defendant possessed the intent to commit the aggravated robbery,

which was the underlying offense.

The evidence, considered in the light most favorable to the State, proves that the victim went to a bar on the night of March 6, 2010, with approximately $100.00 in cash, his landlord's cellular phone, and his medication kept in a plastic pill container. Later that night, two men, one large and one considerably shorter, were seen calmly walking away from the dying victim at the Wayside Inn. The two men were walking toward a maroon, older-model Cadillac. Shortly thereafter, the Defendant and Kelley, who matched the description of the men seen leaving the Wayside Inn, were stopped while in a maroon, older-model Cadillac. The victim later died from a skull fracture caused by blunt force trauma. He had bruising to his arm and thigh and broken ribs. The victim had a distinctive bruise on his back which was consistent with a tire tool found in the Defendant's car on the night of these crimes. The victim's pill case was found lying near him, and the cellular phone and his wallet were missing.

After the Defendant and Kelley were stopped by police and told about the investigation concerning a serious assault or attempted homicide, the Defendant asked, "Is he dead?" Thereafter, the Defendant gave to the police his consent to search his vehicle under the condition that he be allowed to stand by his car during the search. Police found a bloody shoe in the trunk of the car. The blood was the victim's, and epithelial cells found inside the shoe were matched to Kelley's DNA sample. From inside the back of the police car, the Defendant stated that the source of the blood on the shoes was from a dog that had cut his leg.

At the detective's office after his arrest, the Defendant requested use of a bathroom, inferring that he needed to have a bowel movement. Police allowed the Defendant use of the bathroom unaccompanied, even though he had not yet been strip-searched. Officer Ellis noticed that when the Defendant exited the bathroom, there was an excessive amount of water on the floor. Several days later, a plumber was called to fix the toilet, and the victim's identification was recovered from inside the toilet as the source of the clog.

Considering premeditation factors, a tire tool was procured to beat the unarmed victim. The victim was hit repeatedly, sustaining bruising to his back, thigh, and arm. He also sustained multiple broken ribs, and his skull was fractured. Thereafter, the Defendant attempted to conceal the crimes by disposing of the stolen wallet containing the victim's

24

identification. He was calm following the killing, offering no assistance and walking away from the victim as he lay bleeding on the ground. The victim possessed both cash and pills on the night of these crimes. *See Bland*, 958 S.W.2d at 660; *Nichols*, 24 S.W.3d at 302;. *Halake*, 102 S.W.3d at 668. We conclude that these factors support the jury's finding that the Defendant acted with premeditation when he killed the victim.

Further, the evidence also supports the jury's finding that the Defendant participated in an aggravated robbery that resulted in the victim's death. The Defendant drove his car, with Kelley as a passenger, away from the crime scene immediately after the crimes. The Defendant admitted to a fellow inmate that he kicked and hit the victim. The victim's pill container was found removed from the victim's pocket and lying on the ground near the victim. The cellular phone the victim carried that night and his identification wallet were missing. The identification wallet was later found stuck in a toilet in the detective's office bathroom that the Defendant had earlier used upon his arrest. The victim died of injuries sustained through blunt force trauma. Bruising to the victim's back and the skull fracture were consistent with an injury caused by a tire iron like the one found in the Defendant's trunk on the night of the aggravated robbery and homicide.

Accordingly, we conclude that the evidence is sufficient to support both the convictions for first degree murder beyond a reasonable doubt. As such, the Defendant is not entitled to relief on this issue.

## 2. Aggravated Robbery

The Defendant contends that the State failed to show that he knowingly took anything from the victim. The State responds that there was sufficient evidence that the Defendant "unlawfully, and intentionally or knowingly obtain[ed] property" from the victim. We agree with the State.

A conviction for aggravated robbery, as relevant to this case, requires proof beyond a reasonable doubt that the Defendant committed an "intentional or knowing theft of property from the person of another by violence or putting the person in fear" and the victim suffered serious bodily injury. T.C.A. §§ 39-13-401(a), -402(a)(2) (2010).

25

The evidence, considered in the light most favorable to the State, showed that two men, one large and one considerably smaller, were seen calmly walking away from the dying victim at the Wayside Inn. The two men were walking toward a maroon, older-model Cadillac. The Defendant owned a car matching this description and was found, along with Kelley, in the Cadillac a short time after the assault against the victim. Kelley and the Defendant also matched the physical description of the men seen leaving the Wayside Inn. Items that the victim normally kept in his pockets were found either lying near him at the scene or completely missing. A cellular phone in the victim's possession that night was later found in Kelley's possession, and the victim's identification was found inside a toilet the Defendant used the night of these events. The victim died as a result of blunt force trauma causing a skull fracture. He additionally had bruising and broken ribs. A distinctive bruise on his back was consistent with a tire tool recovered from the Defendant's car. After his arrest, the Defendant admitted to a fellow inmate that he kicked and hit the victim. This evidence supports the jury's finding that the Defendant intentionally or knowingly committed a theft from the victim by violence and that the victim suffered serious bodily injury.

Accordingly, we conclude that the evidence is sufficient to support the conviction for aggravated robbery beyond a reasonable doubt. As such, the Defendant is not entitled to relief on this issue

### 3. Tampering with Evidence

To convict the Defendant of tampering with evidence, the State needed to establish, beyond a reasonable doubt, that the Defendant, knowing that an investigation or official proceeding was pending or in progress, altered, destroyed, or concealed any record, document, or thing with the intent to impair its verity, legibility, or availability as evidence in the investigation or official proceeding. T.C.A. § 39-16-503(a)(1) (2010).

The Defendant asserts that the proof did not show beyond a reasonable doubt that he placed the ID case in the commode. The State responds that there was sufficient proof that the Defendant attempted to conceal and destroy evidence. We agree with the State.

The evidence, considered in the light most favorable to the State, shows that the victim routinely carried his identification in a clear plastic case in his front pants pocket.

26

When police searched the victim's body for identification, none was found.  After the Defendant was transported to the police department, he indicated to Officer Ellis that he needed to use the restroom.  Officer Ellis allowed the Defendant to enter the bathroom unaccompanied.  The Defendant had been searched for weapons, but a full strip-search had not been completed.  After a period of time, the Defendant exited the bathroom, and Officer Ellis noticed a "considerable amount of water" on the bathroom floor.  The victim's identification case was later recovered from the toilet.  This evidence supports a jury's finding that the Defendant attempted to conceal the victim's identification from police officers investigating the aggravated robbery and assault.

Accordingly, we conclude that the evidence is sufficient to support the conviction for tampering with evidence beyond a reasonable doubt.  As such, the Defendant is not entitled to relief on this issue.

### III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the judgments of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE